LOUIS ROESEL, PLAINTIFF IN ERROR, v. THE STATE OF
NEW JERSEY, DEFENDANT IN ERROR.

Argued July 1, 1898—Decided July 8, 1898.

1. Where several accused are indicted jointly, the court, in its discretion, may order that they be tried separately.

2. Upon the trial of R., upon an indictment against M. and R., for murder in attempting to commit a robbery, the charge of the trial judge—that if the jury found, from the evidence, that M. and R. agreed to go to the house of P. for the purpose of robbing the house, and that they went there in pursuance of that agreement and purpose, and while there together P. received from one a blow that caused his death, both are guilty of murder of the first degree, no matter which struck the blow—was correct.

3. Before a confession made by a prisoner charged with crime, to an officer in whose custody he is upon that charge, can be received in evidence, it must be shown that the confession was voluntary, and this preliminary examination is for the court and comprises a mixed question of law and of fact.

4. A confession by an accused to one in authority, to be admitted in evidence, must be voluntary. By this is meant that the confession must not be extorted by threats or obtained by any direct or implied promises. A confession obtained either by the flattery of hope or by the impressions of fear is not admissible evidence.

5. The promise or hope excited must relate to some benefit to be derived by the prisoner in the criminal prosecution.

6. The ground on which confessions made by a party accused under promises of favor or threats of injury are excluded as incompetent, is not because any wrong is done to the accused in using them, but because he may be induced by the pressure of hope or fear to admit facts unfavorable to him without regard to their truth.

7. Though it is necessary to the admissibility of a confession that it should have been voluntarily made—that is, that it should have been made without the pressure of hope or fear from persons having authority—yet it is not necessary that it should have been the prisoner's own spontaneous act

8. That the accused was in confinement or imprisonment under an accusation of having committed the murder at the time of making his statement, will not of itself exclude it from being used as evidence, nor will such confession be excluded by the fact that it was elicited by questions put to the prisoner, no threats or promises being used. In all such cases the situation of the prisoner and the manner in which the confession was obtained, are a legitimate subject of comment before

the jury, as the circumstances may tend to impair the credit to be given to the witnesses' testimony or as tending to show the untruthfulness of the confession.

9. On the preliminary examination the officer testified that he made no threats and no promises; that he informed the prisoner that he was an officer of the court, and that he need not talk to him at all if he didn't want to; that whatever he said could be used for him or against him. On the evidence offered on the preliminary examination the trial court received the confession in evidence. *Held—* .

1. That the testimony was properly received.

2. That if the conduct of the officer, in obtaining the confession, was reprehensible—no threats or promises being used—his conduct in that respect might have been used before the jury to affect his credibility or the truthfulness of the confession.

3. That the language used by the officer, "that whatever the prisoner said could be used either for or against him," did not exclude the confession. *Regina* v. *Drew*, 8 *Car. & P.* 140, disapproved; *Regina* v. *Baldry*, 2 *Den. C. C.* 430, followed; *Bram* v. *United States*, 18 *Sup. Ct.* 182, discussed.

10. If the accused contends that the confession was improperly obtained, testimony on that subject may be introduced upon the preliminary examination.

11. If there be a conflict of evidence as to whether the confession was or was not voluntary, if the court decides that it was admissible, the question may be left to the jury with the direction that they should reject it if, upon the whole evidence, they were satisfied that it was not the voluntary act of the defendant.

12. The finding of the trial court on the question of fact that the confession was voluntary will not be set aside unless the evidence on its face does not support the conclusion upon which the trial court based its judgment.

13. On the hearing of exceptions to evidence, the court, on writ of error, will look at the entire record. This is conspicuously the case on writs of error controlled by the act of 1894. *Gen. Stat., p.* 1154, § 170.

14. Upon the trial the prisoner was called as a witness in his own behalf, but did not controvert the testimony of the officer as to his confession or the circumstances under which it was made, and refused to submit to a cross-examination with respect to his connection with the crime. *Held*, that no issue on the question of the voluntary character of the confession having been presented to the jury, the finding of the trial court, on competent and pertinent evidence, of the preliminary question on which the competency of the testimony of the defendant depended, would not be set aside. .

15. By the common law, in a civil case, if the jury rendered a verdict in violation of law they were liable to be punished by an attaint. In criminal cases the jury had a right to find a general verdict compounded

of the law and fact without being liable to punishment by writ of attaint. In this respect only was there any distinction between a jury in a civil case and a jury in a criminal case, the court directing the jury in both cases on matters of law, leaving to the jury the determination of the matters of fact. The maxim *"Ad questionem facti non respondent judices,"* so *"Ad questionem juris non respondent juratores,"* applies as well to criminal cases as to civil cases. *Sparf and Hansen* v. *United States,* 156 *U. S.* 51, approved.

16. Under the power to create courts contained in the commissions to Lord Cornbury and his successors, Courts of General Sessions of the Peace, Courts of Common Pleas, a Supreme Court, the Court of Chancery and the Prerogative Court were established. The Court of Oyer and Terminer, as a court of criminal jurisdiction, was established in West Jersey in 1693 and re-established by the act of November 27th, 1794. These are the courts still in existence in this state. Neither by the ordinances nor by statute were the practice and procedure of these courts prescribed, these matters being left to the common law. By the first constitution of this state, adopted July 2d, 1776, the common law of England was declared to be and remain in force. Among the common law principles thus established in this state was the doctrine defining the relative functions of the court and the jury in the trial of criminal cases, and the judges of the courts of this state have from time immemorial been accustomed, in the trial of criminal cases, to instruct juries that, while questions of fact were for their consideration, they were to take the law from the court.

17. The trial court declined to charge that the jury was the judge of the law as well as of the fact, and gave an instruction in these words: "The credibility of witnesses and the conclusions of fact which you will draw from the evidence are questions which you must settle. The law of the case you must take from the court. If the court lays down the law incorrectly the defendant will have his remedy by appealing to a higher court." *Held,* that this instruction was correct.

18. Indictments for libel have, by statute and constitutional provisions, been taken out of the class of other criminal cases in some respects. *Quære* as to the right of the jury in prosecutions for libel to determine the law as well as the fact.

On writ of error to the Court of Oyer and Terminer of the county of Union.

Louis Roesel and George Manshande were indicted for the murder of James C. Pitts, early in the evening of the 9th of September, 1897, at Summit, in the county of Union. Both of the accused pleaded not guilty. On the application of the

state and of Manshande the court made an order that the accused be tried separately. Exception was taken to this order of the court and error assigned thereon. Roesel was put upon trial under the indictment at the term of May, 1898, and he will be called the prisoner in this opinion. Manshande, by his own consent, became a witness for the state. Roesel, by the verdict of the jury, was found guilty of murder in the first degree. A writ of error was sued out May 25th, 1898. The writ brought up the record of the entire proceedings at the trial and was argued upon the errors assigned thereon.

For the plaintiff in error, *Frank Bergen* and *Edward Nugent.*

For the defendant in error, *Frederick C. Marsh* and *Nicholas C. J. English,* prosecutor of the pleas.

The opinion of the court was delivered by

DEPUE, J.   The error assigned on the order of the court directing that the two persons accused should be tried separately requires no discussion. The power of the court to order several accused charged in the same indictment to be tried separately is well settled. The counsel of the plaintiff in error made no point on that exception either in their briefs or on the oral argument.

Manshande, at the trial, testified that Roesel told him that Pitts had a large amount of money in his house, and urged him to go with him and rob the house; that on the 9th of September Roesel purchased two tickets on the Delaware, Lackawanna and Western railroad from New York to Summit; that they rode on these tickets to Summit; that they walked from the Summit station to Pitts' residence and went into a barn near by and waited until someone who was in Pitts' house went away. Manshande further testified that after the visitor went away he and Roesel went out of the barn to carry out their purpose of robbery; that Roesel

picked up a piece of wood, called a gambrel, and they both went to the door of Pitts' house, and when Pitts opened the door Roesel struck him the blow on the head which caused his death. Manshande also testified that before he and Roesel left New York they procured two masks and two pieces of rope, the masks to conceal their faces and the rope to tie the two occupants of the house.

There was ample testimony to confirm the testimony of Manshande. The railroad tickets which he says Roesel purchased. were found, soon after the murder, on or near the premises of the deceased, and the ticket agent who sold them identified them as the tickets sold to Roesel. The conductor on the railroad also identified the tickets by his punch-mark. The date on the tickets showed that they had been issued on the 9th of September. The deceased was found dead, lying upon his back upon the floor of the kitchen of the house, with a wound in his forehead and blood under his head. Mary Davis, who was the only other inmate of the house, testified that she was awakened by a noise while lying on a lounge in the same room, and when she arose and went towards where the body of Pitts lay a small man with a mask on his face struck her two severe blows, after which she made her way to a neighbor's house and gave the alarm. Woodruff, to whose house Mary went, testified that he reached the house of the deceased about eight o'clock in the evening and found the deceased lying on the floor, dead. A mask made of black woolen, with green lining inside, was found the next morning at the north corner of the barn, and a piece of a German newspaper published in New York of the date of September. 9th. A rope about twenty-five feet long was found on adjoining premises, alongside of the road, the morning after the murder.

The prisoner was a competent witness and was sworn in his own behalf. He did not deny the matters of fact testified to by Manshande except that he denied that he had struck the blow, nor did he contradict any of the facts testified to by the other witnesses in the case. The testimony of Manshande

is strongly confirmed by the failure of the defendant to controvert by his testimony the facts testified to by Manshande. After testifying to his age and birthplace, the entire testimony of the prisoner with regard to the charge on which he was upon trial is as follows :

"*Q.* You heard the testimony of George Manshande, did you?

"*A.* I did, sir.

"*Q.* Did you strike Mr. Pitts?

"*A.* I didn't understand.

"*Q.* Wait; did you strike Mr. Pitts——

"*A.* No, sir.

"*Q.* Wait a minute—with a club or any other weapon, on the evening of September 9th last?

"*A.* No, sir.

"*Q.* Or at any other time?

"*A.* No, sir."

The prisoner was then handed over to the prosecutor for cross-examination, and all inquiry by the prosecutor touching the connection of the prisoner with the preparation for and the execution of this crime was objected to by the counsel of the prisoner and excluded by the court, on the ground that it was not a cross-examination.

The prisoner at the trial, so far as his connection with the commission of this crime was concerned, put himself upon the fact that the blow that killed the deceased was not struck by him. On this evidence the contention was at the trial, and in the assignments of error here is, that under those circumstances the prisoner was not guilty of murder. The trial judge charged the jury that if they found from the evidence that Manshande and Roesel agreed to go to the house of Pitts for the purpose of robbing the house, and that they went there on the 9th of September, in pursuance of that agreement and purpose, and that they were together at the door of Pitts' house for that purpose, and while there together Pitts received from one of these men a blow that caused his death, they are

both guilty of murder in the first degree, no matter which one struck the blow.

The sixty-seventh section of the Crimes act enacts " that if any person or persons in committing or attempting to commit sodomy, rape, arson, robbery or burglary, or any unlawful act against the peace of this state, of which the probable consequence may be bloodshed, shall kill another, or if the death of anyone shall ensue from the committing or attempting to commit any such crime or act as aforesaid, * . * * then such person or persons so killing as aforesaid, on conviction, shall be adjudged to be guilty of murder." *Gen. Stat., p.* 1062. Section 271 of the Crimes act provides " that all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in perpetrating or attempting to perpetrate any arson, rape, sodomy, robbery or burglary, shall be deemed murder of the first degree." *Gen. Stat., p.* 1100.

By the common law, all who were present, aiding and abetting in a felony, are principals. *Coal Heavers' Case,* 1 *Leach C. C.* 64, *Fost.* 428. With regard to what will constitute such a presence as will render a man a principal, it is said, by Mr. Justice Foster, that if several persons set out together or in small parties upon one common design, be it murder or other felony, or for any other purpose unlawful in itself, and each takes the part assigned him, some to commit the fact, others to watch at proper distances to prevent a surprise or to favor, if need be, the escape of those who are immediately engaged, they are all, provided the fact be committed, present at it. *Fost.* 350. Thus, where A waits under a window while B steals articles in the house, which he throws through the window to A, the latter is a principal in the offence. *Owen's Case,* 1 *Moo. C. C.* 96; *Rosc. Cr. Ev.* 213. " If divers persons come in one company to do any unlawful thing, as to kill, rob or beat a man, or to commit a riot, or to do any other trespass, and one of them in doing thereof kill a man, this shall be adjudged murder in them all that are present of

that party abetting him and consenting to the act or ready to aid him, although they did but look on." 1 *Hale C. L.* 441. Roesel and Manshande were engaged in a common purpose— the robbery of the deceased. Both were principals and equally guilty for the acts done by either, and if death ensued from the committing or attempting to commit such a crime, the offence was murder, whether the blow was struck by the one or the other. And, by section 271, murder committed in perpetrating or attempting to perpetrate the crime designed by both these parties, is made murder of the first degree. The charge of the trial court, that if the accused was found guilty he should be convicted of murder of the first degree, was correct.

Error is assigned, also, on an exception taken to the admission of the testimony of John Keron. Keron was county detective and had charge of the accused as a prisoner. His official position was disclosed and was well known to the prisoner. He first saw the prisoner in the Richmond county jail, Staten Island, on the 6th of October. He afterwards saw him in the Union county jail and had conversations with him. The first of these conversations was on the 5th of January, 1898, in the presence of Mr. Blohr, the warden ; Chief of Police Stewart, Manshande, and Smith, the deputy warden, all of whom were public officers except Manshande and Roesel. Before the witness was allowed to testify to anything that the prisoner said he was required by the court to detail the circumstances under which those conversations took place, with a view of ascertaining whether, in fact, the declarations of the prisoner were made under such circumstances as would allow them to be given in evidence. On such preliminary examination Keron testified that he told the prisoner he needn't talk to him at all if he didn't want to ; that anything he said might be used either for or against him ; that he told him, also, on Staten Island on two occasions ; that he told him two or three times in jail " that he needn't speak to me at all about it ; that I was an officer of the court and from the office of the prosecutor." The wit-

ness further testified that he warned him "on every occasion he came to talk to me about it;" that he warned him the morning of the conversation of the 5th of January and told him "I was here to talk with him with reference to this case; that he needn't talk to me at all if he didn't want to, and that whatever he said could be used either for or against him;" that he made no threats or promises to him; that at this interview of the 5th of January Keron said that Manshande had told him (the witness) about being up at White House on the 7th of September, and also that the prisoner had accompanied him (Manshande) to Newark, and from there they went to Summit, stopped at a gypsy camp, and that they lay down alongside of the road and slept all night under the trees. "I asked Louis if that was true." To all of these statements the prisoner declared that they were lies. The witness further testified that he (Roesel) told Manshande to stop his lying; that there wasn't any truth in what he said about going to New York and about going out there and sleeping in the grove—in the woods; "and then the prisoner made the remark to me, 'Chief, you have got two innocent men here; the man who did that murder is in Summit, and it wouldn't be very hard to get him.' I told him that if he could get him he could do more than I could." He denied everything that Manshande had said and was sent back to the jail. At this interview there was no admission by the prisoner of anything touching his connection with this crime.

The interview of the 11th of January is of more importance. Manshande was then present with the prisoner. Keron testified that before anything was said to the prisoner he cautioned him again about his talking; that he told him he needn't talk unless he wanted to, and if he did it could be used either for or against him. Keron testified that before anything was said by the prisoner he, Keron, said to him, "I have come to see you in reference to the Pitts case and you needn't answer me any questions if you don't choose to, and whatever you say may be used for you or against you;" that he, Keron, held up a pair of pants and asked the prisoner

if they were his, and he said they were; that he asked Manshande, in the prisoner's presence, whose they were, and Manshande said they were his but had been worn by the prisoner; that as soon as the prisoner heard Manshande say that he, the prisoner, said, "Oh, that is your racket, you left-handed son-of-a-bitch; you did it." And from that time the prisoner said, "I want to talk." Keron testified that a stenographer was sent for to take down the conversation; that after the stenographer came there Keron repeated the same thing over to Louis with respect to his being under no obligation to talk unless he chose to; that whatever he said might be used for him or against him, and he needn't say anything at all if he didn't want to; that the prisoner then said he wanted to tell the story now and he started off and told it; that he told about going to the premises of the deceased on Monday night and sleeping in the barn; that Manshande was to go in—that the prisoner was to go in with the pistol and present it at Mr. Pitts' face; if Pitts offered any resistance Manshande was to go in and tie him and when he got through with him they were to go over and tie Mary; that he admitted that they went there to rob; that Manshande stood at the door and he heard something like chickens in the trees; he told Manshande to hold on, and he had gone out to see what this noise was and before he got back the blow was struck; that after Manshande had struck the blow and Pitts had fallen he then went in and clubbed Mary. On cross-examination Keron testified that the prisoner said that he did not strike the blow that was given the deceased.

The contention is that, notwithstanding the testimony of Keron in his preliminary examination, the declarations of Roesel in the interview of January 11th were improperly received in evidence. Keron was a person in authority within the meaning of the rule relating to the admissibility of confessions. A confession by an accused to one in authority to be admitted in evidence must be voluntary. By this is meant that the confession must not be extorted by any sort of threats or violence nor obtained by any direct or implied promises.

Mr. Russell adds to this statement of the principle the expression "nor by the exercise of any improper influence." An examination of the comments in the text and the cases cited indicates that by the words "improper influence" is meant influence exerted by threats or promises. 3 *Russ. Cr.* 367. In every definition that purports to be exact that has come under my observation the word "voluntary" is used as contrasted with inducements by means of threats or promises. In Hawkins the rule is stated to be that "A confession, whether made upon an official examination or in discourse with private persons, which is obtained from a defendant either by the flattery of hope or by the impressions of fear, however slightly the emotions may be implanted, is not admissible evidence, for the law will not suffer a prisoner to be made the deluded instrument of his own conviction." 4 *Hawk. P. C.* 425. In *Warickshall's Case*, 1 *Leach C. C.* 248, Chief Baron Eyre said : "A confession forced from the mind by the flattery of hope or by the torture of fear comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it, and therefore it is rejected." This language is often quoted in the text-books and in the opinions of courts as a correct exposition of the law. Mr. Taylor, after quoting the language of Chief Baron Eyre, says: "The material question consequently is whether the confession has been obtained by the influence of hope or fear, and the evidence on this point, being in its nature preliminary, is addressed to the judge, who would require the prosecutor to show affirmatively to his satisfaction that the statement was not made on the influence of an improper inducement, and who, in the event of any doubt subsisting on this head, will reject the confession." 1 *Tayl. Evid.*, § 872. This passage is quoted with approbation, in the judgment of the court, in *Regina* v. *Thompson*, 2 *Q. B.* 12, 13 (1893). It is adopted, in this respect, from Mr. Greenleaf. 1 *Greenl. Evid.*, § 219. In Commonwealth v. Morey, Chief Justice Shaw states the principle in these words : "The ground on which confessions made by a party accused under

promises of favor or threats of injury are excluded as incompetent, is not because any wrong is done to the accused in using them, but because he may be induced by the pressure of hope or fear to admit facts unfavorable to him, without regard to their truth, in order to obtain the promised relief or avoid the threatened danger, and therefore admissions so obtained have no just and legitimate tendency to prove the facts admitted." 1 *Gray* 462, 463. This language of the Chief Justice was quoted with approval in *Commonwealth* v. *Tuckerman,* 10 *Gray* 173, 191. "The object of all the care which is taken to exclude confessions which are not voluntary, is to exclude testimony not probably true." 1 *Greenl. Evid.,* § 231.

The promise or hope excited must relate to some benefit to be derived by the prisoner in the criminal prosecution. Though it is necessary to the admissibility of a confession that it should have been voluntarily made—that is, that it should have been made without the pressure of hope or fear from persons having authority—yet it is not necessary that it should have been the prisoner's own spontaneous act. It would be received though it were induced by a promise of some collateral benefit or boon, no hope or favor being held out in respect to the criminal charge against him, or by any deception practiced on the prisoner, or false representation made to him for the purpose, provided there is no reason to suppose that the inducement held out was calculated to produce any untrue confession or lead the prisoner to suppose that it would be better for him to admit himself guilty of an offence which he had not committed. So, a confession is admissible though elicited by questions, whether put to the prisoner by a magistrate, officer or private person, and the form of the question is immaterial to the admissibility, even though it assumes the prisoner's guilt. 1 *Tayl. Evid.,* § 881 ; 1 *Greenl. Evid.,* § 229 ; 1 *Phil. Evid.* 405, 406 ; *Steph. Dig. Evid., arts.* 22, 24, *pp.* 53, 59 ; *Rosc. Cr. Evid.* 48. That the accused was confined or in irons, under an accusation of having committed the murder at the time of making his state-

ment, will not of itself exclude it from being used as evidence. That fact is a circumstance not to be overlooked, as it may bear upon the inquiry whether the confession was voluntarily made or was extorted by threats or violence, or made under the influence of fear. But confinement or imprisonment is not of itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary and was not obtained by putting the prisoner in fear or by promises. *Whart. Cr. Evid.*, §§ 661, 663; *Sparf and Hansen* v. *United States*, 156 *U. S.* 51, 55. In all such cases the evidence may be laid before the jury, however little it may weigh under the circumstances, and however reprehensible may be the mode in which it was obtained. 1 *Greenl. Evid.*, § 229; 1 *Tayl. Evid.*, § 881.

But the contention is that the language used by Keron— "that he need not talk to me at all if he did not want to, and that whatever he said could be used either for or against him"—excluded the confession. *Regina* v. *Drew*, 8 *Car. & P.* 140, is cited to sustain this contention. In that case it was held by Mr. Justice Coleridge that where the officer had said to the prisoner, "do not say anything to prejudice yourself, as what you say I shall take down, and it will be used for you or against you at the trial," disentitled the confession subsequently made to be used in evidence. This case, with two other kindred cases, was overruled by the Court of Criminal Appeals. *Regina* v. *Baldry*, 2 *Den. C. C.* 430; *S. C.*, 2 *Big. Lead. Cr. Cas.* 484. In commenting on Regina v. Drew and other similar cases, Mr. Taylor says: "In these and the like cases it is only too apparent that justice and common sense have been sacrificed on the shrine of mercy. Indeed, the judges themselves have, of late years, come to this conclusion, and after a solemn discussion of the subject in the Court of Criminal Appeals they have expressly overruled the last three decisions cited above [*Regina* v. *Harris*, 1 *Cox C. C.* 106; *Regina* v. *Drew*, 8 *Car. & P.* 140; *Regina* v. *Morton*, 2 *Moo. & R.* 514] as cases which are discreditable to the law." 1 *Tayl. Evid.*, § 884. In the decision of Regina v. Baldry,

Chief Baron Pollock said: "With regard to the cases of
Regina *v.* Drew and Regina *v.* Morton, with the greatest re-
spect for my brother Coleridge, I do not approve of the deci-
sion in the former or of the argument used to uphold it in the
latter. I think the statement made by the prisoner in Regina
*v.* Drew ought not to have been rejected. He was told 'that
what he said would be taken down and would be used for him
or against him at the trial.' The whole effect of the sentence
was that the man was told that whatever he said would be
taken down and used as evidence in the cause—that is, the
truth would be stated on the trial." Baron Parke, in con-
curring with the Chief Baron, said: "By the law of England,
in order to render a confession admissible in evidence, it must
be perfectly voluntary, and there is no doubt that any induce-
ment in the nature of a promise or of a threat, held out by a
person in authority, vitiates a confession. The decisions to
that effect have gone a long way. Whether it would not have
been better to have allowed the whole to go to the jury it is
now too late to inquire, but I think there has been too much
tenderness towards prisoners in this matter. I confess that I
cannot look at the decisions without some shame when I con-
sider what objections have prevailed to prevent the reception
of confessions in evidence, and I agree with the observation
of Mr. Pitt Taylor, that the rule has been extended quite too
far and that justice and common sense have too frequently
been sacrificed at the shrine of mercy. * * * I have reflected
on Regina *v.* Drew and Regina *v.* Morton, and I have never
been able to make out that any benefit was held out to the
prisoner by the caution employed in those cases." Mr. Jus-
tice Erle, concurring in the decision, said: "I am much in-
clined to agree with Mr. Pitt Taylor, and according to my
judgment, in many cases where confessions have been excluded,
justice and common sense have been sacrificed, not at the
shrine of mercy but at the shrine of guilt." Mr. Justice Wil-
liams, concurring, said: "What was said to the prisoner was
nothing more than what he said would not be kept secret but
would be used in evidence, and it is an over-refinement to say

that a statement made after such·a caution was inadmissible."
Chief Justice Lord Campbell said : " With regard to the deci-
sions of my brother Coleridge and my brother Maule, with the
greatest respect for them, I disagree with their conclusions."
This subject is discussed in the note to *Regina* v. *Baldry,*
2 *Big. Lead. Cr. Cas.* 572, 630, and also in 3 *Am. & Eng.
Encycl. L.* 439, 496.

The prisoner's counsel also relied upon *Bram* v. *United
States,* 168 *U. S.* 532 ; 18 *Sup. Ct. Rep.* 182. The opinion in
that case was delivered by Mr. Justice White. The rules of
law controlling the subject and the application of them to the
facts of a particular case are different questions. The learned
justice does not call in question the rule adopted in the Eng-
lish courts and contained in the text-books, that a confession
made by a prisoner to one in authority will not be excluded
from being received in evidence where it is made to appear
in the preliminary investigation that it was not procured by
threats or induced by promises or advice having reference to
some advantage the prisoner might secure on a criminal prose-
cution. Among the English cases cited are those in which
some expression appears which was calculated to lead the
prisoner to believe that it would be better for him to say
something or are the class of cases disapproved by Mr. Tay-
lor. Regina *v.* Drew, Regina *v.* Morton, Regina *v.* Furey
and Regina *v.* Harris were cited, it cannot be said with appro-
bation, for the learned justice states·that these cases were held
to have been erroneously decided in Regina *v.* Baldry, which
he characterizes as the leading case.

As introductory to the citation of American authorities the
learned justice said that in the Supreme Court of the United
States the general rule that the confession must be free and
voluntary—that is, not produced by inducements engendering
either hope or fear—was settled by the authorities referred to
in the opinion. The citations from the state courts are all to
this effect : " The best thing you can do is to tell all about it,
and to tell who was with you, and to tell the truth, the whole
truth and nothing but the truth." " It will be better for you

to make a full disclosure." " I don't think the truth will hurt anybody; it will be better for you to come out and tell all you know about it if you feel that way." " If you do so it will go easy with you; it will be better for you to confess; the door of mercy is open and that of justice closed." " The suspicion is general against you and you had as well tell all about it; the prosecution will be no greater; I don't expect to do anything with. you; I am going to send you home to your mother." " If you know anything it may be best for you to tell it," or " If you know. anything go and tell it and it may be best for you." " It will go better with you to tell where the money is; all I want is my money, and if you tell me where it is I will not prosecute you hard." " It will be better for you to tell the truth and have no more trouble about it." " You had better own up; I was in the place when you took it; we have got you down fine; this is not the first you have taken; we have got other things against you nearly as good as this." " You had better tell the truth." " It will be better for you to confess." " It will be better to tell the prosecuting witness all about it, and that the officer thought the prosecuting witness would withdraw the prosecution or make it as light as possible." " If you are guilty you had better own up." " The best thing you can do is to own up; it will be better for you." " I believe you are guilty; if you are you had better say so." " If you are guilty I would advise you to make an honest confession; it might be easier for you; it is plain against you." " You had as well tell all about it." These are the illustrations given from the decisions of the state courts. In each of these cases there was language that might be construed as amounting to a promise or advice that induced the prisoner to make a statement in the belief that he would be benefited by doing so.

The summing up of the law on this subject by Chief Baron Pollock in Regina *v.* Baldry, quoted with approbation by Mr. Justice White, is applicable as well to the American as to the English cases: "A simple caution to the accused to tell the truth, if he says anything, has been decided not to be suffi-

-cient to prevent the statement being given in evidence, and although it may be put that when a person is told to tell the truth he may possibly understand that the only thing true is that he is guilty, that is not what he ought to understand. He is reminded that he need not say anything, but if he says anything let it be true. It has been decided that that would not prevent the statement being received in evidence, by Mr. Justice Littledale, in the case of *Rex* v. *Court*, 7 *Car. & P.* 486, and by Baron Rolfe, in a case at Gloucester, *Regina* v. *Holmes*, 1 *Car. & K.* 248 ; but where the admonition to speak the truth has been coupled with any expression importing that it would be better for him to do so, it has been held that the confession was not receivable, the objectionable words being that it would be better to speak the truth, because they import that it would be better for him to say something. This was decided in the case of *Regina* v. *Garner*, 1 *Den. C. C.* 329. The true distinction between the present case and a case of that kind is that it is left to the prisoner a matter of perfect indifference whether he should open his mouth or not."

The case on which Bram *v.* United States was decided was this : The charge against the prisoner was murder on shipboard. Power, a member of the police department of Halifax and a detective, testified that after the arrival of the ship at Halifax, in consequence of a conversation with Charles Brown, a seaman and one of the crew, he made an examination of Bram in the city hall when no one was present besides Bram and the witness. He testified that no threats were made in any way to Bram and no inducements held out to him. The witness was then asked, " What did you say to him and he to you ? " The defendant's counsel was permitted to cross-examine the witness before the court ruled upon the objection, and the witness stated that the conversation took place in his office, where he had caused the defendant, Bram, to be brought by a police officer ; that up to that time the defendant had been in the custody of the police department of Halifax ; that the witness asked that the defendant should be brought to his office for the purpose of interviewing him ;

that at his office he stripped the defendant and examined his clothing but not his pockets; that he told the witness to submit to an examination and that he searched him; that the defendant was then in custody and did everything the witness directed him to do. The witness answered questions by the court as follows:

"*Q.* You say there was no inducement to him in the way of promise or expectation of advantage?

"*A.* Not any, your honor.

"*Q.* Nor anything said in the way of suggesting to him that he might suffer if he did not—that it might be worse for him?

"*A.* No, sir; not any.

"*Q.* So far as you were concerned, it was entirely voluntary?

"*A.* Voluntary, indeed.

"*Q.* No influence on your part exerted to persuade him one way or the other?

"*A.* None whatever, sir; none whatever."

The defendant then renewed his objection to the conversation which had taken place between Bram and the witness. The objection was overruled and the witness answered as follows:

"When Mr. Bram came into my office I said to him, 'Bram, we are trying to unravel this horrible mystery.' I said, 'Your position is rather an awkward one; I have had Brown in this office, and he made a statement that he saw you do the murder.' He said, 'He could not have seen me. Where was he?' I said, 'He states he was at the wheel.' 'Well,' he said, 'he could not see me from there.' I said, 'Now look here, Bram, I am satisfied that you killed the captain, from all I have heard from Mr. Brown. But,' I said, 'some of us here think you could not have done all that crime alone. If you had an accomplice you should say so, and not have the blame of this horrible crime on your own shoulders.' He said, 'Well, I think, and many others on board the ship think, that Brown is the murderer; but I

don't know anything about it.' He was rather short in his replies." The testimony of the witness was received.

It is apparent, from the opinion of the learned justice, that he did not regard the situation of Bram, at the time inquiry was made of him, as of itself excluding the confession, for he concedes that the mere fact that the confession was made to a police officer while the accused was under arrest, in or out of prison, or was drawn out by questions, did not necessarily render the confession involuntary. All that was claimed with respect to these facts was that such imprisonment or interrogation might be taken into account in determining whether or not the statements of the prisoner were, in fact, induced by promises or threats that were made. After referring to the situation of the prisoner the learned justice adds: "Moreover, aside from the natural result arising from the situation of the accused and the communication made to him by the detective, the conversation conveyed an express intimation rendering the confession involuntary within the rule laid down by the authorities. What further was said by the detective? 'Now, look here, Bram; I am satisfied that you killed the captain, from all I have heard from Mr. Brown; but,' I said, 'some of us here think you could not have done all that crime alone; *if you had an accomplice you should say so, and not have the blame of this horrible crime on your own shoulders.*' But how could the weight of the whole crime be removed from the shoulders of the prisoner as a consequence of his speaking unless benefit as to the crime and its punishment was to arise from his speaking? * * * Thus viewed, the weight to be removed by speaking naturally imported a suggestion of some benefit as to the crime and its punishment as arising from making a statement." The decision, in fact, was made in subordination to the legal rule contended for— that to disqualify a confession from being in evidence it must be obtained by means of threats or suggestions of some benefit or advantage in the criminal prosecution.

It is conceded that attempts on the part of police officers to obtain a confession by interrogation have been reproved

by the courts as unfair to the prisoner, but not as excluding the confession. In all such cases the situation of the prisoner and the manner in which the confessions were obtained are a legitimate subject of comment before the jury as to the effect of the evidence. The truth of Keron's testimony in this case was, as will be seen presently, practically conceded by the prisoner. No request was made by counsel to instruct the jury to consider his testimony in the light of the manner in which the confession was brought about.

The facts upon which the decision in Bram *v.* United States was made are entirely different from those before the court below when Keron's testimony was held to be competent. The prisoner was brought out of the jail, and, in the presence of public officials, was interrogated. He was told what Manshande had disclosed, and was asked if that was true. The blue pants were exhibited, and the prisoner was asked about them. Though this conduct of the officials may have been reprehensible, and might under some circumstances tend to impair before the jury the value of this evidence, it did not of itself render it illegal, for out of that situation no inference could be drawn of any threat on the part of Keron or suggestion of any benefit that the prisoner might derive from any statement he might make in the pending prosecution. He was repeatedly informed and advised by Keron, in the most emphatic manner, that he need make no declaration or admission to him; that he need not answer any question that might be asked if he didn't choose; that he needn't say anything at all if he didn't want to. The prisoner was at liberty to speak or not, as he saw fit, and his silence under such circumstances could not be made evidence against him. To affect one person with the statements of others, on the ground of his implied admission of their truth by silent acquiescence, it is not enough that they were made in his presence or even to himself, but they must also have been made on an occasion when a reply from him might properly be expected. 1 *Tayl. Evid.*, § 814; *Commonwealth* v. *Kenney*, 12 *Metc.* 235, 237; *Donnelly* v. *State*, 2 *Dutcher* 463, 504, 601, 612, 632, 634. In the case

last cited, Mr. Justice Ogden, delivering the opinion of this court, discussing the question whether declarations of the deceased, in the presence of the prisoner and not contradicted, should be received in evidence, said: " If it appeared that it [the declaration of the deceased] was made  *  *  *  when circumstances existed which rendered a reply inexpedient or improper, or that fear, doubts of his rights or belief that his security would be better promoted by silence than by response governed him at the time, then the testimony should not have been admitted, for the reason that the jury in such case ought not to have been allowed to infer anything against the prisoner from his silence." On some of these occasions Keron used the words that whatever the prisoner said might be used for or against him. But, as was said in the leading case of Regina *v.* Baldry, such a statement made to the prisoner could have no tendency to induce the prisoner to say anything untrue. As was said by Chief Baron Pollock, in Regina *v.* Baldry: " The whole effect of such a statement made by the officer was that the prisoner was told that whatever he said would be taken down and used as evidence in the cause—that is, the truth would be stated on the trial." " If the party has made his own calculation of the advantages to be derived from confessing, and thereupon has confessed the crime, there is no reason to say that it is not a voluntary confession." 1 *Greenl. Evid.,* § 220 *a.*

The burden of proof is on the state to show that the confession was voluntary. The preliminary examination, which is for the court, comprises a mixed question of law and fact. How far the determination of the question of fact by the court is a subject of review, is a matter on which there is a conflict of decision. The rule laid down by Mr. Greenleaf is as follows: " This matter resting wholly, in the discretion of the judge, upon all the circumstances of the case, it is difficult to lay down particular rules, *a priori,* for the government of that discretion. The rule of law applicable to all cases only demands that the confession shall have been made voluntarily, without the appliances of hope or fear by any other person;

and whether it was so made is for the judge to determine, upon consideration of the age, situation and character of the prisoner and the circumstances under which it was made. Language sufficient to overcome the mind of one may have no effect upon that of another—a consideration which may serve to reconcile some contradictory decisions." 1 *Greenl. Evid.*, § 219. This language is adopted by Mr. Taylor. 1 *Tayl. Evid.*, § 872. In *Commonwealth* v. *Piper*, 120 *Mass.* 185, 188, Mr. Justice Morton stated the rule in these words : " When a confession is offered in a criminal case, and the defendant objects that he was induced to make it by threats or promises, it necessarily devolves upon the court to determine the preliminary question whether such inducements are shown. And the finding of the court upon this question cannot be revised upon a bill of exceptions unless it involves some ruling in matter of law or the whole evidence is reported with a view of submitting its sufficiency to the appellate court. If the presiding judge is satisfied that there were such inducements, the confession is to be rejected ; if he is not satisfied, the evidence is to be admitted. But if there is any conflict of testimony or room for doubt, the court will submit this question to the jury with instructions that if they are satisfied that there were such inducements, they shall disregard and reject the confession." In State *v.* Guild, Chief Justice Ewing used this language : " Whether, when the confessions given in evidence were made, the mind of the prisoner was laboring under or was freed from undue influence. These questions present pure inquiries of fact. What, in point of fact, was the actual state of mind of the prisoner ? We have seen that the Court of Oyer and Terminer acted under a correct view of the law, that they prosecuted their search into the facts on sound legal principles, and that they compared the facts before them with a correct legal standard. Now, the duty of this court, when a reference like the present is made to us by that tribunal, is chiefly to examine and revise matters of law. So, in England, when the advice of twelve judges is required. We cannot review a question of fact with those advantages

possessed by the court before whom the witnesses have appeared.    To pass in judgment on the conclusions of that court, we ought to stand, if not on superior, at least on equal ground. Such a point of view may be obtained in the examination of legal principles, but is rarely accessible in the search of facts. Hence, on this occasion we might, after an investigation of the legal doctrines, desist on this head from further inquiry. But after expressing, as we are bound to do, a just deference for the determination of the court, we shall proceed to examine it under such lights as the report of the case affords us." 5 *Halst.* 163, 181, 182.

If the accused contends that the confession was improperly obtained, testimony on that subject may be introduced on the hearing of the preliminary question.    *People* v. *Fox*, 121 *N. Y.* 449 ; *Commonwealth* v. *Culver*, 126 *Mass.* 464.    Persons other than the witness by whom it is proposed to prove the confession being present, their testimony may be offered with a view of contradicting, explaining or showing that the confession was so obtained that it should be either excluded or if received the jury should be instructed to disregard it.    If there be a conflict of evidence as to whether the confession was or was not voluntary, if the court decides that it is admissible, the question may be left to the jury, with the direction that they should reject it if upon the whole evidence they were satisfied that it was not the voluntary act of the defendant.    *Wilson* v. *United States*, 162 *U. S.* 613 ; *Hopt* v. *Utah*, 110 *Id.* 574, 584.

In State *v.* Guild the trial court had submitted to the consideration of the jury the circumstances under which the confessions were obtained, with the instruction that it was their business to consider the confessions with respect to the manner in which they were obtained, and if they were not satisfied that the confessions were made freely and understandingly and wholly free from any expectation of benefit raised by hope and promises, it was their duty to reject them from their minds and not to make them the foundation of their verdict.

This mode of submitting the question was approved by the court.

In *State* v. *Aaron*, 1 *South.* 231 ; *State* v. *Guild*, 5 *Halst.* 163, and *State* v. *Brooks*, 1 *Vroom* 356, the decisions were made on a case certified, asking the Supreme Court for its advisory opinion. The Donnelly case was on error, and the question there related to the admission of a declaration of the deceased in the presence of the prisoner. The act of 1894 (*Gen. Stat., p.* 1154) is comprehensive enough to include an exception of this character. But in whatever way the finding of the trial court of the question of fact comes up for review, its finding will not be set aside unless the evidence, on its face, does not support the conclusion on which the trial court based its judgment. *Johnson* v. *State*, 30 *Vroom* 271 ; *S. C., Id.* 535 ; *Clawson* v. *State, Id.* 435, 437 ; *Patterson* v. *State*, 19 *Id.* 382 ; *Jersey City* v. *Tallman*, 31 *Id.* 239 ; *Voorhis* v. *Terhune*, 21 *Id.* 147 ; *Johnson* v. *Arnwine*, 13 *Id.* 451. The proof was clear that no threats or promises were made or even a suggestion that the prisoner would be benefited by making a confession. To repeat the language of Chief Baron Pollock : " It was left to the prisoner as a matter of perfect indifference whether he should open his mouth or not." " If the prisoner made his own calculation of the advantages to be derived from confessing and thereupon confessed the crime, there is no reason to say that it is not a voluntary confession." 1 *Greenl Evid.*, § 220 *a.*

The confession was properly admitted in evidence.

There is another consideration that is not to be disregarded. On the hearing of exceptions taken to the admission of evidence the court will also look at the entire record. This is conspicuously the case on writs of error controlled by the act of May 2d, 1894, which provides " that the entire record of the proceedings had upon the trial of any criminal cause may be returned by the plaintiff in error therein with the writ of error, and when so returned shall be considered and adjudged by the appellate court; and if it appear from such record that the plaintiff in error on the trial below suffered

manifest wrong or injury, whether by rejection of testimony or in the charge made to the jury, or in the denial of any matter by such court, which was a matter of discretion, or upon the evidence adduced upon the trial, the appellate court shall remedy such wrong or injury and give judgment accordingly and order a new trial." *Gen. Stat., p.* 1154, § 170. The return to the writ is of the indictment, with all things touching the same, including the entire proceedings had upon the trial, and is so certified by the trial court. The court, on hearing criminal cases, is required by this statute to look at the entire record of the proceedings and is authorized to reverse the judgment and grant a new trial only where it appears from the entire record of the proceedings that the plaintiff in error sustained manifest wrong or injury.

Blohr and Smith, who were present at the interview of Keron with the prisoner, were called as witnesses on behalf of the prisoner. They were interrogated with respect to admissions made by Manshande that he struck the blow that killed the deceased. Neither of these witnesses was examined by the defendant with respect to the interview of Keron with the prisoner, in which the confessions were made, nor did the prisoner, in his examination, controvert the testimony of Keron with regard to the statements made to him by Keron. The reason upon which a confession is rejected is that the prisoner may have been induced, by the pressure of hope or fear—induced by promises or threats—to make a confession that is untrue. *Commonwealth* v. *Morey,* 1 *Gray* 452, 463; *Commonwealth* v. *Tuckerman,* 10 *Id.* 173, 191; 1 *Greenl. Evid.,* § 231. Here no promises or threats were made, and the prisoner, on his examination as a witness in his own behalf, by his silence when he was called upon to speak and by his refusal to be cross-examined with respect to his connection with the crime, conceded that his statements to Keron were true. If means were employed by Keron that were reprehensible, that fact would only justify comments before the jury as tending to impair the credit to be given to Keron's testimony or as tending to show the untruthfulness

of the confession. No issue on that subject was presented to the jury. Add to that the finding of the trial court, on competent and pertinent evidence, of the preliminary question on which the legality of the testimony depended, without any evidence tending to discredit the finding, and it is difficult to perceive on what ground, consistent with reason or with the due administration of justice, the confession should now be set aside.

The confession was properly received in evidence at the time it was offered, but if there had been any scruple on that subject, a reversal, upon a consideration of the entire record of the proceedings at the trial, would not be justified.

The remaining assignment of error is upon an exception taken to the judge's charge with respect to the respective functions of the court and the jury in the trial of criminal cases. The prisoner's counsel contended that the jury was the judge of the law as well as of the facts. The judge declined to so instruct the jury and gave an instruction in these words: "The credibility of witnesses and the conclusions of fact which you will draw from the evidence are questions which you must settle. The law of the case you must take from the court. If the court lays down the law incorrectly the defendant will have his remedy by appealing to a higher court. But if jurors disregard the law as laid down by the court the administration of justice would soon become a mockery, and no man would be safe in his person or property."

By the common law there was a distinction between the rights of jurors in a civil and in a criminal case. In a civil case, if the jury rendered a verdict in violation of law they were liable to be punished by an attaint. The procedure by attaint lay not only if the verdict were false in fact, but even if it were false in law though true in fact, because it was considered that they ought either to follow the direction of the judge or return a special verdict on which there was no attaint. 3 *Reeve Com. L.* 304 (*Finl. note*). Consequently, in civil cases jurors resorted to the expedient of finding the

facts specially in the form of a special verdict, leaving the final decision of the case to the court. In criminal cases the jury had a right to find a general verdict compounded of the law and fact without being liable to punishment by a writ of attaint. 2 *Hawk. P. C.*, c. 72, *p.* 133; 1 *Co. Litt.* 155 *b*, *note;* 5 *Bac. Abr.* 384, *tit. "Juries,"* M. In this respect only was there any distinction between a jury in a civil case and a jury in the trial of a criminal case, the court directing the jury in both cases on matters of law, leaving to the jury the determination of the matters of fact. As early as 10 *Hen. II.* Mr. Justice Herle is reported as saying: "Hereby it appeareth that it is the office of the judges to instruct the grand assize or jury in points of law, for, as the grand assize or other jurors are triers of the matters of fact, *ad questionem facti non respondent judices*, so *ad questionem juris non respondent juratores.* And accordingly the judge in that case directed the grand assize, namely, if they found that, &c. Wherefore judgment final was awarded." *Co. Litt.* 295 *b.* "In every case where the point turneth upon the question whether the homicide was committed willfully and maliciously or under circumstances justifying, excusing or alleviating, the matter of fact, viz., *whether the facts alleged by way of justification, excuse or alleviation are true*, is the proper and only province of the jury, but whether, upon a supposition of the truth of facts, such homicide be justified, excused or alleviated must be submitted to the judgment of the court, for the construction the law putteth upon facts stated and agreed or found by a jury is in this, as in all other cases, undoubtedly the proper province of the court. In cases of doubt and real difficulty it is commonly recommended to the jury to state facts and circumstances in a special verdict, but where the law is clear the jury, under the direction of the court in point of law, matters of fact being still left to their determination, may, and if they are well advised always will, find a general verdict conformable to such direction. *Ad questionem juris non respondent juratores."* *Fost.* 255. In Commonwealth *v.* Anthes, Chief Justice Shaw, speaking for the ma-

jority of the court, said that, up to the period of the separation of the colonies from England the fundamental definition of trial by jury depended upon this universal maxim without any exception.  5 *Gray* 185, 219.

It is not proposed to discuss this subject at length.  That has been done in opinions of great ability and research by Mr. Justice Harlan, speaking for the majority of the court, and Mr. Justice Gray, in a dissenting opinion.  The decision of the court in that case, pronounced by Mr. Justice Harlan and concurred in by the majority of the court, was that in the courts of the United States it was the duty of the jury in criminal cases to receive the law from the court and apply it as given by the court, subject to the condition that by a general verdict a jury of necessity determines both law and fact as compounded in the issue submitted to them in the particular case.  *Sparf and Hansen* v. *United States,* 156 *U. S.* 51.  This decision was rested upon the common law as established in England before the separation of the colonies from the mother country.  In this exposition of the common law we concur, and for this reason, in our judgment, the law of this state is in conformity with the decision of the federal court.

Mr. Justice Gray dissented from this judgment, and his dissent was concurred in by Mr. Justice Shiras.  In his opinion, Mr. Justice Gray refers to the law of this state on this subject as apparently unsettled.  He refers to an act contained in the provincial laws of this state, wherein it was enacted "that the trial of all causes, civil and criminal, shall be heard and decided by the verdict of twelve honest men of the neighborhood; that there shall be, in every court, three justices or commissioners, who shall sit with the twelve men of the neighborhood, with them to hear all causes, and to assist the said twelve men of the neighborhood in case of law; and that they, the said justices, shall pronounce such judgment as they shall receive from and be directed by the said twelve men, in whom only the judgment resides, and not otherwise; and, in case of their neglect and refusal, that then one of the twelve, by consent of the rest, pronounce their own judgment

as the justices should have done." *Leam. & Spi.* 396, 398. The learned judge refers also to *State* v. *Jay*, 5 *Vroom* 368, and *Drake* v. *State*, 24 *Id.* 23.

By the grant of Charles II., of March 12th, 1664, the soil comprised within the province of New Jersey was granted to James, Duke of York, afterwards James II., together with the rights of sovereignty. James, by a grant made June 24th in the same year, granted the territory to Lord John Berkley and Sir George Carteret, together with the same rights of sovereignty he had acquired by his grant. Under this grant Berkley and Carteret became Lords Proprietors of the province of New Jersey, and a government, consisting of a governor, a council and a general assembly, was established in the province, in all respects under the control of the proprietors, Philip Carteret being the first governor. The province having been conquered by the Dutch, and restored to the English crown by the treaty of peace, Charles, by letters-patent dated June 29th, 1674, renewed his grant to James, and James, by his grant of the 29th of July, 1674, granted to Sir George Carteret that part of the province north of a creek called Barnegat, described in the grant as being "about the middle between Sandy Point and Cape May, and thence up the Delaware river to the northernmost branch thereof." The tract of land granted was therein declared thereafter to be called by the name or names of "New Cæsarea" or "New Jersey." Other persons, namely, William Penn, Gawen Laurie and Nicholas Lucas, having acquired Lord John Berkley's interest in the grant of June 24th, 1664, by a quintipartite deed made July 1st, 1676, partition was made of the province in two parts, to be called respectively "East Jersey" and "West Jersey," Carteret retaining East Jersey and Penn and his associates West Jersey. After this each division had its own council and house of assembly, the functions of which were wholly distinct. The Duke of York, by grant dated August 6th, 1680, confirmed the title to West Jersey in Penn and his associates, with powers of government. The act referred to by Mr. Justice Gray was passed by the assembly

of West Jersey at the session of 1681.   It is substantially
the same as is contained in chapter 19 of the " Concessions
and Agreements of the Proprietors of West Jersey."   The
act had no application to East Jersey.   The courts in East
Jersey, as established by the assembly, were county courts,
justices' courts and courts of common right, the latter being
the Supreme Court, having jurisdiction of all matters, causes
and cases—capital, criminal or civil—cases of equity and cases
triable at common law.   The procedure in the court of com-
mon right was left to be regulated by the common law, with
no semblance of the features contained in the act relating to
courts in West Jersey and with no provision with respect to
trial by jury, except that where matters of fact were disputed
the fact should be found by the verdict of twelve men, " as it
ought of right to be done by the common law."   *L. & S.*
229, 230, 232.   The anomalous procedure, under the act of
the West Jersey assembly, having no affinity with common
law methods, and the act being in force only in one division
of the province, it cannot be invoked as an exposition of the
common law as recognized in this colony with respect to the
relative rights and duties of the court and jury in criminal
cases.

The government by the board of proprietors being unsatis-
factory throughout the province, the power of the crown to
transfer to individuals the sovereignty in its colonies was de-
nied in the mother country, and the title of the proprietors to
the soil was disputed by the settlers.   In May, 1701, the
inhabitants of West Jersey petitioned the king to be taken
under the immediate government of the crown.   In July of
the same year the inhabitants of East Jersey presented a simi-
lar petition.   These petitions were referred to the lords of
trade, who recommended that a trial should be had upon a
feigned issue whereby the claim of the proprietors to the right
of government might be determined.   2 *N. J. Arch.* 380, 394,
420.   Discouraged in their efforts to establish a government
in the province and desiring to save so much of the grant as

vested title to the soil, the proprietors, by an instrument of
surrender of April 15th, 1702, surrendered and yielded up to
the crown all their powers, authorities and privileges concern-
ing the government of the two provinces or either of them or
of the inhabitants thereof, reserving to themselves the title to
the soil.    This surrender was accepted by the crown.    The
result was the consolidation of the two divisions of East and
West Jersey into and under one government, with one gov-
ernor and one general assembly for the enactment of laws.
The first governor appointed after the surrender was Lord
Cornbury.    In the commission issued to him it was declared:
"And we do further give and grant unto you full power and
authority, with the advice and consent of our said council, to
erect, constitute and establish such and so many courts of
judicature and public justice within our said province under
your government as you and they shall think fit and neces-
sary for the hearing and determining of all causes, as well
criminal as civil, according to law and equity, and for award-
ing execution thereupon, with all reasonable and necessary
powers, authorities, fees and privileges belonging unto them."
Under the power to create courts contained in Lord Corn-
bury's commission, which was substantially retained in the
commissions of his successors, several ordinances were issued,
each entitled "An ordinance for the establishment of courts
of judicature."    By these ordinances the following courts
were established: Courts of General Sessions of the Peace,
Courts of Common Pleas, having power and jurisdiction to
try and determine all actions and causes of action and all
matters and things triable at common law of whatever nature
and kind soever; a Supreme Court, having cognizance of all
pleas, civil, criminal and mixed, as fully and amply, to all
intents and purposes whatsoever, as the Courts of Queen's
Bench, Common Pleas and Exchequer of England have or
ought to have, with jurisdiction over the prerogative writs of
*certiorari, habeas corpus* and writ of error; the Court of
Chancery and the Prerogative Court.

The Court of Errors and Appeals, consisting of the governor and council, was established by the instructions to Lord Cornbury. *Field's Prov. Courts* 257; 302; *Smith's Hist.* 500; 1 *Halst. (Appendix)* 1; 4 *C. E. Gr. (Appendix)* 577. By the surrender of the sovereignty and the acceptance of it by the crown, the grants and concessions made by the proprietors during the period of their government came to an end, and when courts were established by ordinances under the authority of the crown the courts that theretofore had been established were abolished. The ordinances made no provision for the practice and procedure in these courts. In that respect these courts were left to be governed by the practice and procedure of the corresponding courts in England and according to the course of the common law. Mr. Smith, writing under the date of 1765, says: " The courts are established in virtue of the royal commission; none (excepting the six-pound court) by act of assembly. The common law is in use as in England. The customs and rules of legislation and practices of the courts are as near as may be in the English model; the latter is thought to be as much so by good judges as that of any other colony." *Smith's Hist.* 501. And the first constitution of this state, adopted July 2d, 1776, provided "that the common law of England, as well as so much of the statute law as has heretofore been practiced in this colony, shall remain in force until they shall be altered by a future law of the legislature; such parts only excepted as are repugnant to the rights and privileges contained in this charter, and that the inestimable right of trial by jury shall remain confirmed as part of the law of this colony without repeal forever." The concluding paragraph of this constitutional provision retains and confirms the institution of trial by jury in civil as well as in criminal cases. No implication arises from this language of a purpose to enlarge the powers of jurors, in either civil or criminal cases, beyond what they were at common law or to obliterate the line that by the common law separated the functions of the jury from those of the court. A Court of Oyer and Terminer

for the trial of capital cases was established in West Jersey in 1693. *Leam. & Spi.* 520.

At the first session of the legislature after the declaration of independence, an act was passed declaring that the several courts of law and equity of this state should be confirmed and established, to be held with like powers under the present government. *Wils. L.* 3. This statute did not create a Court of Oyer and Terminer, but, as will appear by the recital in an act passed on the 20th of September, 1777, Governor Livingston, acting on the assumption that the power to create courts conferred on Lord Cornbury and his successors, devolved upon him as governor, created Courts of Oyer and Terminer and General Jail Delivery by commission. By the act just referred to, the proceedings, transactions and adjudications of such courts were declared to be valid, and it was made lawful for the governor or commander-in-chief of this state for the time being, with the advice of the council, as occasion should require, to constitute and appoint by commission Courts of Oyer and Terminer and General Jail Delivery in the respective counties of this state, " in the manner heretofore used under the former government." *Wils. L.* 22. The Court of Oyer and Terminer, as a court of criminal jurisdiction as it now exists, was established by the act of November 27th, 1794. *Pat. L.* 157. The practice and procedure of all these courts of our state continue to this day to be regulated by the common law, with the exception of such acts of the legislature as regulate the practice and to some extent modify the jurisdiction of some of these courts. None of the latter statutory provisions has any relevancy to the subject now under consideration.

In England, the rights of jurors on the trial of an indictment became the subject of much controversy, but that controversy concerned only prosecutions for libel. The controversy commenced in 1770, with the direction of Lord Mansfield to the jury in Rex *v.* Woodfall, which was an information for publishing a seditious libel. On the trial Lord Mansfield directed the jury to consider whether all the innu-

endoes and all the applications to matter and persons made by the information were in their judgment the true meaning of the paper, and that if they agreed with the information and believed the evidence as to the publication, they should find the defendant guilty, that whether the paper was in law a libel was a question of law upon the face of the record. The jury found the defendant guilty of printing and publishing only. The verdict was set aside, on the ground that it was ambiguous and uncertain, but the charge of Lord Mansfield was sustained by the whole court. 5 *Burr.* 2666, 2668. The effect of this charge was to withdraw from the jury that part of the accusation which was embodied in the allegation that the publication was done willfully and maliciously. The struggle was resumed in Rex *v.* Shipley, known as the Dean of St. Asaph's case (1789). The defendant was indicted for libel. Mr. Justice Buller, in summing up, told the jury that there were only two questions for their consideration, namely, the fact of the publication and the truth of the innuendoes, for that whether the publication were or were not a libel was a matter for the consideration of the court appearing upon the record. The jury found the defendant guilty of publishing, but whether a libel or not, they did not find. The case coming before the full bench, the opinion of the court, delivered by Lord Mansfield, affirmed the correctness of the ruling and contended that, under the authorities, such had been the established practice. 4 *Doug.* 73.

In *King* v. *Withers*, 3 *T. R.* 428, Lord Kenyon gave the same directions to the jury. The erroneous feature of this mode of instruction to juries·insisted upon was twofold—first, that it withdrew from the jury the determination of a question of fact—the intention with which the publication was made—and secondly, that it deprived the jury of the right to render a general verdict compounded of law and fact, as in other criminal cases. In Dean of St. Asaph's case, Mr. Justice Willes, dissenting, declared: "In the first place, I conceive it to be the law of this country that the jury, upon a plea of not guilty or upon the general issue upon an indictment or information

for a libel, have a constitutional right, if they think fit, to examine the innocence or criminality of the paper, notwithstanding there is sufficient proof given of the publication. Secondly, I conceive it to be the law that if, upon such examination, the jury should, contrary to the judge's direction, acquit the defendant generally, such a jury are not liable either to attaint, fine or imprisonment, nor can this court set aside the verdict of deliverance by a new trial or by any other means whatsoever." It will also be observed that, in the memorable debate on this subject in the House of Lords, the first and most prominent question propounded to Lord Mansfield by Lord Camden was this: "Does the opinion mean to declare that, upon the general issue of not guilty in the case of a seditious libel, the jury have no right by law to examine the innocence or criminality of the paper if they think fit, and to form their verdict upon such examination?" And in the course of the debate Lord Camden said he would venture to affirm, and should not be afraid of being contradicted by any professional man, that, by the law of England as it now stood, the jury had a right, in deciding on the libel, to judge whether it was criminal or not, and juries not only possessed that right, but they had exercised it in various instance. Lord Campbell, in commenting on Lord Mansfield's doctrine with respect to the issue involved in the trial of an indictment for libel, said that it rested upon the transparent fallacy that whether a paper amounts to a libel or not is invariably a pure question of law. 2 *Campb. Lives of Ch. J.* 364, 372, 412.

The Dean of St. Asaph's case was decided in 1783, King v. Withers in 1789, and in 1791 an act known as the Fox Libel act was introduced and was passed in 1792. 32 *Geo. III., c.* 60. This act was passed after our Revolution. The act, though in form declaratory of the common law, is not obligatory upon us, for when the power of parliament to legislate for this country ceased, its power, by a retrospective act, to declare the state of the common law of England during the colonial period, also ceased. The purport of that

statute is that, on every such trial—that is, on an indictment for libel—the jury may give a general verdict of guilty or not guilty upon the whole matter put at issue upon such indictment or information, and shall not be required or directed by the court or judge to find the defendant guilty merely on the proof of the publication by the defendant of the paper charged to be a libel and of the sense ascribed to the same in the indictment or information ; that on every such trial the court or judge shall, in his discretion, give his opinion and directions to the jury on the matter in issue in like manner as in other criminal cases.   6 *Ev. Stat.* 203.   In commenting on this statute and the decisions that preceded it, Lord Blackburn said : " It seems to me clear that, whilst Lord Mansfield held that the question of libel or no libel was one exclusively for the court, Mr. Justice Willes held that it was also a question for the jury, but he did not hold it to be a question exclusively for the jury.   On the contrary, whilst holding that if the jury found the defendant not guilty it was conclusive in his favor, he expressly held that, after a verdict of guilty, it still was competent for the defendant to take the opinion of the court as to whether the publication was libelous or not."   But Lord Blackburn adds : " It is no longer material whether Lord Mansfield or Mr. Justice Willes was right in his view of the law as it stood in 1784, for by 32 *Geo. III.* it is enacted by the first section what the law shall be in the future.   The legislature has adopted almost the words, and quite the substance, of that part of Mr. Justice Willes' judgment which I have first quoted, and from that time there can be no doubt that a defendant cannot be convicted of libel unless the jury find that the tendency of the publication was libelous."   *Capital and Counties Bank* v. *Henty, L. R.,* 7 *App. Cas.* 772, 775.   Whatever the effect of this statute may have been upon the law of England, it is incapable, for the reasons above stated, of affecting the common law as in force in England at the time of the separation of the colonies from the mother country.

   The convention that framed our constitution of 1844 was

composed of a body of men conspicuous for their knowledge of the law and of the institutions of this state. In framing the constitution this body of men did not adopt the English statute of George III. The freedom of the press and prosecutions for libels were provided for in these sections: "No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel the truth may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous is true and was published with good motives and for justifiable ends, the party shall be acquitted, and the jury shall have the right to determine the law and the fact." *Const., art.* 1, ¶ 5. The truth of the matter charged as libelous and the motives with which the same was published were by this constitutional prescription made a matter of defence, presenting an issue of fact such as was for the consideration of the jury at common law. Upon the words in the English statute, "in like manner as in other criminal cases," an argument was founded that by that statute it was declared to be the law of England that in all criminal cases the jury had the right to determine the law as well as the fact. That expression was omitted from our constitutional provision. The force and effect of the words in the constitution, "that the jury shall have the right to determine the law and the fact," although applicable only to prosecutions for libel, may be said to be unsettled in the sense that the signification of these terms has not been established by any judicial decision.

In *State* v. *Jay*, 5 *Vroom* 368, and *Drake* v. *State*, 24 *Id.* 23, the contention was that in prosecutions for libel the jury, by force of the constitution, was made the judge of the law and the fact and vested with the right to review the rulings of the court on matters of law, as to all matters of variance between the proof and the allegations in the indictment, as well as to its rulings admitting or excluding evidence. This construction of the constitutional provision was repudiated by the court. In the case first cited Chief Justice Beasley said: "Every person at all versed in the history of our law is

aware that the constitutional amendment in question * * * was intended to amend the law, the evil being that by a course of decisions the jury had been deprived of their right to deal in the ordinary mode with this class of prosecutions." The question he declared to be an open one was whether or not the jury, on the case being submitted to them, can decide the law for themselves, disregarding in this particular the instructions of the judge presiding at the trial. He added: "According to my present understanding, the jury have not been clothed with any such right, the sole effect of the provision being to place prosecutions for libel on the same footing with other criminal proceedings, so that the jury can in this class of cases not only settle the facts, but also make the proper application of the law as expounded by the court to such facts." These remarks of the Chief Justice plainly indicate the opinion of that eminent and experienced jurist that neither by the law as it was in England before the Revolution nor by the law of this state was the jury in a criminal case vested with any other right than to settle the facts and make the proper application of the law as expounded by the court to such facts.

It is not necessary to express any opinion in this case as to whether prosecutions for libel are on the same plane as prosecutions in other criminal cases. Since the opinion of Lord Mansfield, in Rex *v.* Woodfall, prosecutions for libel have been placed by statutes and constitutional prescriptions on a plane by themselves. From the earliest period of our judicial history the maxim "*Ad questionem facti non respondent judices,*" so "*Ad questionem juris non respondent juratores,*" has been regarded as expressing the functions of court and jury generally in the trial of criminal cases. By the consensus of the bar and the judiciary, it has been recognized as the established law of this state that in the trial of criminal cases questions of law were for the court and questions of fact for the jury, saving only the right of the jury to render a general verdict where questions of law and fact were combined in the issue. Judges from time immemorial have been

accustomed in the trial of criminal cases to instruct juries that, while questions of fact were for their consideration, they were to take the law from the court.    This form of instruction has been accepted by the bar without dissent, so far as the records of our courts of review disclose.    The files of this court and of the Supreme Court contain numerous records of the proceedings of trials in the most important criminal cases.    Errors have been assigned on the law as declared by the court, but this is the first instance in which, except in the trial of indictments for libel, an exception of this character has been brought to the cognizance of the judiciary of this state.    The instructions of the court on this head were correct.

Finding no error in the record, the judgment should be affirmed.

*For affirmance*—DEPUE, GARRISON, LIPPINCOTT, ADAMS, HENDRICKSON, NIXON, VREDENBURGH.    7.

*For reversal*—THE CHANCELLOR, COLLINS, GUMMERE, LUDLOW, BOGERT.    5.